FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 0 7 2005

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| MARY L. METZLER, | ) |
| | ) |
| Plaintiff, | ) Case No. 1:03-CV-2625- βßM |
| | ) |
| v. | ) |
| | ) |
| GENERAL MOTORS CORPORATION, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants General Motors Corporation, Jerome Hunter, Barry Woods and Gordon Zimmer (hereinafter sometimes collectively referred to in the singular as "GM"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(B)(1), offer the following concise statement of material facts in support of their motion for summary judgment in the above-captioned matter. Based on these facts, which are presented as uncontroverted for purposes of this motion only, and their separately filed memorandum in support, defendants state that no genuine issues of material fact preclude the entry of summary judgment in defendants' favor.

## Plaintiff's Background

1.     Plaintiff Mary L. Metzler, a native of Dearborn, Michigan, began working for GM in October 1983, and until 1989 worked in a variety of positions for GM at three different facilities, all of which were in Michigan. *See* Deposition of Mary Metzler, attached hereto as Exhibit A, at 9-10, 17, 22-24.

2.     On or about May 18, 1998, plaintiff executed a written employment agreement with GM which stated that plaintiff agreed to devote her "time and service" to GM "in such capacity as [GM] may direct," that plaintiff's employment was "from month to month only," and that "there are no other arrangements, agreements or understandings, verbal or in writing, regarding [plaintiff's employment], and that any modification or amendments [of the agreement]  . . . must be endorsed in writing and initialed by both the employee and the employer." *Id.* at 25-27 and Depo. Ex. 2.

## Plaintiff's Assignment to the Doraville Plant

3.     In 1999, while working for a GM Powertrain[1] facility in Warren, Michigan, plaintiff applied for and received another Powertrain position as quality resident manager at GM's Doraville, Georgia assembly plant, a facility located closer to her parents' home in Florida. *Id.* at 29-31.

---

[1] Powertrain is GM's engine and transmission unit.  Ex. A at 24.

4.     Prior to beginning her assignment, plaintiff's predecessor, Mark Miesel, who was leaving the Doraville position to take an international assignment, told plaintiff that defendant Jerome Hunter, the plant's quality manager, was "not a very nice or fair person," that she "really [had] to watch [herself] around him," that he had difficulty working with Hunter, and that Hunter was a "motherf---er." *Id.* at 39-43.

5.     On or about July 16, 1999, plaintiff began her assignment at the Doraville facility, where she was responsible for supporting the Doraville assembly plant on all Powertrain issues concerning engines, transmissions and related components. *Id.* at 36, 39.

6.     Before coming to Doraville, plaintiff had never worked at a GM assembly plant and was not "100 percent comfortable with working with engine componentry in an assembly plant setting," and she acknowledges that she had some difficulty performing her duties at the beginning of her assignment. *Id.* at 25, 43- 45.

7.     In approximately June 2000, plaintiff's supervisor, defendant Barry Woods, called plaintiff and told her that Hunter had been calling him every day "complaining about" plaintiff, and suggested she schedule a meeting with Hunter to discuss his expectations. *Id.* at 48-49.

8.    In August 2000, plaintiff met with Hunter, who told her that he did not think she was serious about her job, but saw from her request for a meeting that she wanted to "get involved." *Id.* at 51-52.

9.    Plaintiff believes Hunter's calls to Woods stopped for a brief period after the August 2000 meeting, but then resumed. *Id.* at 54.

10.    Plaintiff also believes that four other Doraville managers – Ted Crabtree, Sam Curtis, Doug Shephard and B.J. Smith – began ignoring her and making it difficult for her to obtain information needed to perform her job. *Id.* at 54-55.

11.    Hunter complained to other employees that plaintiff was not in the plant because her office light was off, but plaintiff kept her office light off because she performed most of her job duties on the plant floor, which was not near her office. *Id.* at 89.

12.    Hunter never made a sexual overture toward plaintiff, touched her in an inappropriate manner, or made any comments in which he referred to her gender in criticizing her job performance or any other matter. *Id.* at 66.

13.    Plaintiff believes Hunter also treated her differently because she was more educated than Hunter and was from the northern part of the country. *Id.* at 92-93.

-4-

14.   In approximately March 2001, plaintiff was between five and fifteen minutes late for a training class due to a stomach ache, and Hunter – who was unaware of her stomach problem – left her a voice mail message stating she needed to be prompt to meetings. *Id.* at 72-73.

15.   In a discussion with Woods regarding the message, plaintiff stated that she "didn't really need this kind of harassment," and Woods responded by saying: "I know one thing, call it discriminatory, but I would never put another woman down in the Doraville assembly plant." *Id.* at 74-75.

16.   In approximately March 2001, following a visit by Woods from Michigan to the Doraville plant to observe plaintiff perform her job and speak with employees about plaintiff's job situation, Woods told plaintiff that she was meeting his expectations and was doing an excellent job, and that he "never had a doubt in his mind that [she] was a capable manager." *Id.* at 82, 85-87.

17.   Plaintiff believes that other male employees also had difficulty working with Hunter, "[a]nd just about everybody she ever spoke to in the plant did not care for him as an individual." *Id.* at 87.

### Plaintiff's Reassignment from Doraville to Michigan

18.   On May 25, 2001, plaintiff received a voice mail from Woods telling her that the Doraville plant did not want her working there, and that "the best thing for [her] to do is just leave." *Id.* at 97.

19.    Plaintiff was aware that quality resident manager assignments usually lasted for a period between three and six years, and plaintiff is aware of two male quality resident managers who also were removed from their assignments at plants before the three to six-year period had ended.  *Id.* at 34, 103-04.[2]

20.    Plaintiff agrees that it is important for the resident managers to have good working relationships with the plant to which they are assigned, and acknowledges that she did not have a good working relationship with Hunter.  *Id.* at 78, 109.

21.    The weekend following Woods' statement that plaintiff was being transferred out of the Doraville plant, plaintiff suffered a knee injury while playing paddle ball, and as a result went on a paid leave of absence which lasted until March 2002.  *Id.* at 100-01, 110-11.

22.    On August 30, 2001, Woods sent plaintiff a letter indicating that he believed a reassignment was in the best interests of both plaintiff and GM, and informed plaintiff that when she was able to return to work, she would be reassigned to a program quality engineer position in Michigan, a lateral move with no reduction in pay or level.  *Id.* at 113-16 and Depo. Ex. 3.

---

[2] Plaintiff also was aware that Mark Miesel's predecessor at the Doraville plant, Phil Horan, had been fired by Woods.  Ex. A at 44-45.

23.     Sometime after receiving Woods' letter, plaintiff contacted Powertrain's Human Resources group to inquire about other potential positions in the Atlanta area or other parts of the country even further south so that she could remain in close proximity to Florida, but did not attempt to retain her position at the Doraville plant and did not want to return there. *Id.* at 117-19.

24.     On or about February 22, 2002, Joe Mazzeo, a Powertrain quality director, sent plaintiff a memorandum in which he acknowledged her desire to remain in the Atlanta area but explained that Powertrain had nothing available there. *Id.* at 121-22 and Depo. Ex. 5.

25.     Mazzeo gave plaintiff four options following the expiration of her medical leave: (1) report to the new assignment in Michigan; (2) request a "special leave of absence" of up to six months, with no guarantee of reemployment at its conclusion; (3) accept an "external opportunity separation," through which GM would provide her with more than a year of severance benefits; or (4) voluntarily resign. *Id.* at 126-27.

26.     On February 28, 2002, plaintiff wrote Mazzeo and stated she would like to exercise GM's "open door policy" to discuss "the issues" she had with her removal from the Doraville plant." *Id.* at 133, 135 and Depo. Ex. 7.

27.     On March 1, Charles Walls, Powertrain's director of human resources, sent plaintiff an e-mail confirming that if she elected a special leave of absence, it

would last six months and would be unpaid, and "that there was no guarantee of a position at the conclusion of the leave." *Id.* at 136 and Depo. Ex. 8.

28.    Plaintiff applied for the special leave of absence, and on March 26, 2002, Walls e-mailed her approving the leave, which would start on April 1, immediately after the conclusion of her medical leave, and expire on September 30, 2002, again reaffirming that GM would not guarantee her return to active employment at its conclusion. *Id.* at 137-38 and Depo. Ex. 8.

29.    By the time plaintiff requested the special leave of absence, she had voluntarily chosen not to accept the position in Warren, Michigan which had previously been offered to her. *Id.* at 138-39.

30.    On August 29, 2002, as part of the open door process, plaintiff came to Pontiac, Michigan and met with Walls and defendant Gordon Zimmer, the executive director of Powertrain, to discuss plaintiff's options following the conclusion of her leave. *Id.* at 141-42.

31.    Plaintiff was still pursuing opportunities in Atlanta, and believes Zimmer and Walls may have said they did not foresee any openings, but Zimmer indicated he would speak with Mazzeo about any openings at Saab. *Id.* at 142-43.

32.    Walls also told plaintiff that she could take her open door complaint to the next level, which required submitting it to Bashen Consulting, an outside entity, which plaintiff did. *Id.* at 143-46.

33.    On September 30, 2002, the day plaintiff's special leave of absence was set to expire, Walls e-mailed plaintiff stating that Powertrain management had agreed to extend her leave until the completion of the open door process. *Id.* at 147 and Depo. Ex. 11.

34.    On November 13, 2002, plaintiff received a letter stating that based on the Bashen investigation, GM did not find any substantiation to her claim of "gender harassment and/or discrimination." *Id.* at 149-50 and Depo. Ex. 12.

35.    Although plaintiff's extended special leave had been scheduled to expire at the end of the open door process, Walls and Zimmer agreed to extend it again, and met with plaintiff in Michigan on December 4, 2002. *Id.* at 150-51.

36.    At the meeting, plaintiff asked what she needed to do to continue her career at GM, and Zimmer responded by "scream[ing]" at her that she "couldn't come to him at the eleventh hour and ask for [her] job back," and indicated that nothing was available in his division. *Id.* at 156-58.

37.    Zimmer then told plaintiff that she could post for jobs utilizing GM's Opportunity Awareness Posting ("OAP") line, an internal GM job search system operated by GM's Talent Acquisition Center ("TAC"), which is not part of Zimmer's division or under his supervision. *Id.* at 163-65.

CC 1382682v1

38.     Plaintiff indicated she would post for jobs she felt competent to perform or had performed in the past, but "does not recall anything else that [she] might have committed to." *Id.* at 168-69.

39.     Zimmer then asked his assistant to get plaintiff a series of phone numbers, and told plaintiff she was "more than welcome" to use office space and a telephone at the Powertrain offices to contact "former directors, superintendents, colleagues" or anyone else to attempt to find an open position. *Id.* at 166-67.

40.     Powertrain also agreed to extend plaintiff's special leave of absence through the end of the year. *Id.* at 167-68.

41.     On January 3, 2003, plaintiff e-mailed Walls and asked when she was going to be contacted for an interview for the positions she had posted for through the OAP. *Id.* at 167-699 and Depo. Ex. 15.

42.     That same day, Walls responded, telling plaintiff that "[t]he hiring units have control of their posting/interview/selection process," but that if he heard from any of those units regarding an interview, he would pass the information on to her. *Id.* at 169-70.

43.     Plaintiff then sent Walls another e-mail, asking him "[w]hat exactly" he was doing "to assist [her] in getting placed, to which Walls replied by telling her that under the circumstances, it was not his responsibility "to find [her] a position." *Id.* at 173-74.

CC 1382682v1

44.     On February 4, 2003, plaintiff received a call from Kristen Cowan of the TAC in Detroit, Michigan, who said that she had noticed plaintiff had posted for "quite a few positions" through the OAP, but that the postings had not been processed because plaintiff was not on active status. *Id.* at 181-84.

45.     To plaintiff's knowledge, Walls and Zimmer did not have any role in Cowan's call to plaintiff. *Id.* at 184.

46.     Plaintiff is not aware of any GM employee on a special leave of absence who has had their postings to the OAP processed. *Id.* at 185.

47.     On February 6, 2003, Walls sent plaintiff a letter stating that her special leave of absence had expired on January 31, and that she was being considered a "special separation" and would be provided with separation payments of $31,624 over the course of the next six and a half months. *Id.* at 186-87.

48.     On February 14, 2003, plaintiff filed a Charge of Discrimination with the EEOC and Michigan Department of Civil Rights. *Id.* at 190-93.

49.     Plaintiff believes Zimmer made the decision to terminate her employment and believes the decision was based "[p]artially" on her gender, but never heard Zimmer make any comments which were derogatory toward women or otherwise gender-based and "really can't say" why she believes her gender played a role in the decision. *Id.* at 199-200.

-11-

50.    Plaintiff is not aware of any other quality resident managers who were offered a reassignment, turned it down and obtained another position through the efforts of Zimmer, Walls or Woods. *Id.* at 200-01.

Wherefore, based on the Statement of Material Facts set forth above, along with the legal authority set forth in their accompanying memorandum in support, defendants General Motors Corporation ("GM"), Jerome Hunter, Barry Woods and Gordon Zimmer respectfully request that their motion for summary judgment be granted, and for whatever other and further relief the Court deems appropriate.

Respectfully submitted this 7th day of February, 2005.

Counsel certifies that this pleading has been prepared in an appropriate font and type pursuant to Local Rule 5.1(B).

LATHROP & GAGE L.C.

David C. Vogel     Mo. Bar No.  45937
Admitted Pro Hac Vice
2345 Grand Boulevard, Suite 2800
Kansas City, MO 64108-2684
Phone:      (816) 292-2000
Fax:   (816) 292-2001

MCGUIRE WOODS, LLP

Diana D. Suber
1170 Peachtree Street, Suite 2100
Atlanta, Georgia  30309
Phone:      (404) 443-5500
Fax:      (404) 443-5599
ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that a copy of the above and foregoing was mailed U.S. First class mail, postage prepaid, this 7th day of February, 2005, to:

Kenneth W. Sheppard
17931 Georgia Highway
67 South, Suite 2101
Statesboro, Georgia  30458

Attorney for Plaintiff

_____
An Attorney for Defendants

CC 1382682v1