IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARY L. METZLER,

          Plaintiff,

   v.

GENERAL MOTORS
CORPORATION, JEROME
HUNTER, BARRY WOODS and
GORDON ZIMMER,

         Defendants.

CIVIL ACTION FILE NO.

1:03-CV-2625-BBM

## FINAL REPORT AND RECOMMENDATION

Plaintiff Mary L. Metzler filed this action against Defendants General Motors Corporation ("GM"), Jerome Hunter, Barry Woods and Gordon Zimmer, on September 2, 2003. [Doc. 1]. Plaintiff asserts claims against Defendants based on Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, and on 42 U.S.C. § 1981. [Id.]. Plaintiff contends that Defendants discriminated against her based on her gender and subjected her to sexual harassment. [Id.]. Plaintiff also alleges state law claims of wrongful termination, breach of contract and intentional infliction of emotional distress. [Id.]. Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, Defendants have moved for summary judgment [Doc. 29] on all of

Plaintiff's claims based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted by the parties.

1.     **Facts**

When evaluating the merits of a motion for summary judgment, the court must view the evidence and factual inferences in a light most favorable to the non-moving party.   See Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). However, unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment.  See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984).  With respect to the facts relied on for purposes of resolving the summary judgment motion, Local Rule 56.1 provides, in pertinent part, "Response should be made to each of the movant's numbered material facts."  L.R. 56.1 B(2), N.D. Ga.  In the present case, Plaintiff has responded to Defendants' statement of material facts refuting several of those factual statements.  However, Plaintiff failed to offer a single record citation supporting her denials of Defendants' statements.  [Doc. 35 at 18-28].  The court will, therefore, accept as admitted those facts in Defendants' statement that Plaintiff has not "specifically controverted" with citation to relevant portions of the record and which are supported by Defendants' citation to the record.  L.R. 56.1B(2), (3), N.D. Ga.

2

Additionally, in her response to Defendants' summary judgment motion, Plaintiff filed a document which purportedly contained her separate and concise statement of material facts.  [Doc. 35].  The first part of that "statement" contains a list of legal issues which is not a statement of fact and is not supported by any citation to the record.  [Id. at 2-4].  The second part of that document, while setting forth facts with citation to the record, does not comply with this court's local rules nor with the notice to the parties regarding preparation of summary judgment motions and responses thereto.  See L.R. 56, N.D. Ga.  [Doc. 20].  These statements are not set forth in numbered paragraphs containing a single statement of fact, and the number of statements in this part of the document significantly exceed the limitation set by the court. [Doc. 35 at 4-18].  As presented, this "statement" is no more useful to the court than an introductory statement of facts in a legal memorandum and will only be treated as such by the court.

Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendants' motion [Doc. 29] for summary judgment.

Plaintiff Mary L. Metzler, a native of Dearborn, Michigan, began working for GM in October of 1983, and until July of 1999, she worked in a variety of positions for GM

3

at three (3) facilities located in Michigan.  [Defendants' Statement of Material Facts ("SMF") ¶ 1; Plaintiff's Affidavit ("Aff.") ¶¶ 3, 4].  On or about May 18, 1998, Plaintiff executed a written employment agreement with GM which stated that Plaintiff would devote her "time and service" to GM "in such capacity as [GM] may direct," that Plaintiff's employment was "from month to month only," that "there were no other arrangements, agreements or understandings, verbal or in writing, regarding [Plaintiff's employment], and that any modification or amendment [of the agreement] . . . must be endorsed in writing and initialed by both the employee and the employer." [Defendants' SMF ¶ 2; Plaintiff's Aff. ¶ 5].

In 1999, while for working for GM's Powertrain facility, the engine and transmission unit, in Warren, Michigan, Plaintiff applied for and received another Powertrain position as quality resident manager at GM's Doraville, Georgia, assembly plant.  This facility was closer to Plaintiff's parents' home in Florida.  [Defendants' SMF ¶ 3; Plaintiff's Aff. ¶ 6].  On or about July 16, 1999, Plaintiff began her assignment at the Doraville facility, where she was responsible for supporting the Doraville assembly plant on all Powertrain issues concerning engines, transmissions and related components.  [Defendants' SMF ¶ 5].  On May 25, 2001, Plaintiff received a voice mail from Barry Woods, Plaintiff's manager, advising her that the Doraville plant

4

did not want her working there and that "the best thing for [her] to do is just leave."[1] [Defendants' SMF ¶ 18; Plaintiff's Aff. ¶ 8].  The weekend following receipt of the message from Mr. Woods, Plaintiff suffered a non-work related knee injury and, as a result, was placed on a paid leave of absence which lasted until March 31, 2002. [Defendants' SMF ¶ 21; Plaintiff's Aff. ¶ 9].

On August 30, 2001, Mr. Woods sent Plaintiff a letter indicating that he believed a reassignment was in the best interests of both Plaintiff and GM and informed Plaintiff that, when she was able to return to work, she would be reassigned to a program quality engineer position in Warren, Michigan - a lateral move with no reduction in pay or level.  [Defendants' SMF ¶ 22; Plaintiff's Aff. ¶ 10].  Sometime after receipt of Mr. Wood's letter, Plaintiff contacted Powertrain's Human Resources group to inquire about potential positions in the Atlanta area or other parts of the company further south, but she did not attempt to retain her position in the Doraville facility.  Plaintiff did not want to return to that facility.  [Defendants' SMF ¶ 23].  On or about February 22, 2002, Joe Mazzeo, a Powertrain quality director, sent Plaintiff a memorandum in

---

[1]Plaintiff had difficulties working with Jerome Hunter, Doraville's quality manager, for most of the time she worked in the Doraville facility.  [Defendants' SMF ¶¶ 4, 7, 11, 14, 20].

5

which he acknowledged her desire to remain in the Atlanta area; however, he explained that Powertrain had no positions available in that location. [Defendants' SMF ¶ 24]. Mr. Mazzeo's memorandum outlined Plaintiff's options upon the expiration of her medical leave: (1) report to the new assignment in Michigan; (2) request a "special leave of absence" of up to six months, with no guarantee of re-employment at its conclusion; (3) accept an "external opportunity separation," through which GM would provide Plaintiff with more than a year of severance benefits; or (4) voluntarily resign. He also informed Plaintiff that she could "exercise the Open Door Policy to discuss your situation with Powertrain Headquarters Human Resources . . ." but that a decision must be made by March 1, 2002. [Defendants' SMF ¶ 25; Plaintiff's Deposition ("Dep."), Ex. 5; Plaintiff's Aff. ¶ 12]. On February 28, 2002, Plaintiff wrote to Mr. Mazzeo and stated that she would like to exercise GM's "open door policy" and to discuss "the issues" she had with her removal from the Doraville plant. [Defendants' SMF ¶ 26].

On March 1, 2002, Charles Walls, Powertrain's director of human resources, sent Plaintiff an e-mail confirming that if she elected a special leave of absence, it would last for six (6) months and would be unpaid. He further stated "that there was no guarantee of a position at the conclusion of the leave." [Defendants' SMF ¶ 27].

6

Plaintiff applied for the special leave of absence.  On March 26, 2002, Walls e-mailed Plaintiff approving the leave, which would start on April 1, 2002, upon the conclusion of her medical leave, and would expire on September 30, 2002.  [Defendants' SMF ¶ 28; Plaintiff's Aff. ¶¶ 16, 19].  The special leave of absence that Plaintiff accepted specified, among other items, that "[t]he granting of this leave of absence by [GM] is not a guarantee of reemployment following the expiration of the leave[,]" that "[u]pon expiration of this leave, I may be employed if conditions permit[,]" and that "[i]f re-employed, every effort will be made to reinstate me to my former position or one, in the opinion of GM, comparable to it."  [Plaintiff's Dep., Ex. 9].  With the decision to accept the special leave of absence, Plaintiff chose not to accept the position in Warren, Michigan, which had been offered to her.  [Defendants SMF ¶ 25, 28, 29; Plaintiff's Dep. at 138-39].

On August 29, 2002, as part of the open door process, Plaintiff traveled to Pontiac, Michigan, and met with Mr. Walls and with Gordon Zimmer, the executive director of Powertrain, to discuss Plaintiff's options at the conclusion of her special leave of absence.  [Defendants' SMF ¶ 30].  Plaintiff was still pursuing employment opportunities in Atlanta.  She believes Mr. Zimmer and Mr. Walls stated that they did not foresee any openings.  Mr. Zimmer indicated that he would speak with Mr. Mazzeo,

who had previously been employed by Saab and knew people at that location, about positions at Saab.  [Defendants' SMF ¶ 31; Plaintiff's Dep. at 142-43].  However, Plaintiff stated that both Mr. Zimmer and Mr. Walls advised her that they would not be assisting Plaintiff in obtaining re-employment with GM.  [Plaintiff's Dep. at 142].  Mr. Walls also advised Plaintiff that she could take her open door complaint to the next level, which required submitting it to Bashen Consulting, an outside entity.  Plaintiff did so.  [Defendants' SMF ¶ 32].

On September 30, 2002, the day Plaintiff's special leave of absence was set to expire, Mr. Walls e-mailed Plaintiff stating that Powertrain management had agreed to extend her leave until the completion of the open door process.  [Defendants' SMF ¶ 33; Plaintiff's Aff. ¶ 20].  On November 13, 2002, Plaintiff received a letter stating that based on the Bashen Consulting investigation, GM did not find any substantiation to her claim of "gender harassment and/or discrimination."  [Defendants' SMF ¶ 34; Plaintiff's Aff. ¶ 21].  Although Plaintiff's special leave of absence had been scheduled to expire at the end of the open door process, Mr. Zimmer and Mr. Walls agreed to extend it and to meet with Plaintiff in Michigan on December 4, 2002.  [Defendants' SMF ¶ 35; Plaintiff's Aff. ¶ 22].  At the December 4, 2002, meeting, Plaintiff asked what she needed to do to continue her career at GM.  Plaintiff stated that Mr. Zimmer

8

responded by "scream[ing]" at her that she "couldn't come to him at the eleventh hour and ask for [her] job back."  He advised that there were no positions available in his division.  [Defendants' SMF ¶ 36].  Zimmer then advised Plaintiff that she could post for jobs utilizing GM's Opportunity Awareness Posting ("OAP") line, an internal GM job search system operated by GM's Talent Acquisition Center ("TAC").  The TAC is not a part of Mr. Zimmer's division nor under his control.  [Defendants' SMF ¶ 37].  Plaintiff advised that she would post for jobs, and Mr. Zimmer asked his assistant to get Plaintiff a series of telephone numbers and advised Plaintiff that she was "more than welcome" to use office space and a telephone at the Powertrain offices to contact "former directors, superintendents, colleagues" or anyone else to attempt to find an open position.  [Defendants' SMF ¶¶ 38, 39].  During December of 2002, Plaintiff posted for a number of positions on the OAP line.  On December 15, 2002, Plaintiff e-mailed Mr. Zimmer and informed him of this fact and requested another extension of her special leave of absence to give the postings time to process.  On December 17, 2002, Mr. Walls responded to the e-mail, stating that "Gordon and I discussed your request and we have agreed to extend the unpaid leave of absence until January 31, 2003[,] to allow you additional time to gain feedback from your postings."  [Plaintiff's Aff. ¶ 27].

On January 3, 2003, Plaintiff e-mailed Mr. Walls and asked when she was going to be contacted for an interview for the positions that she had posted for through OAP. Mr. Walls responded that day advising Plaintiff that "[t]he hiring units have control of their posting/interview/selection process" but that if he heard from any of the units regarding an interview, he would forward that information to Plaintiff.  [Defendants' SMF ¶¶ 41, 42].  Plaintiff sent Mr. Walls another e-mail asking him "[w]hat exactly" he was doing "to assist [her] in getting placed," to which Walls replied, that under the circumstances, it was not his responsibility "to find [her] a position."  [Defendants' SMF ¶ 43; Plaintiff's Aff. ¶ 29].  On January 27, 2003, Plaintiff notified GM by an e-mail to Mr. Tate and Ms. Rudow, Human Resources Managers and Mr. Wall's superiors, that she had not received a single response to any of the job postings. [Plaintiff's Aff. ¶ 30].

On January 31, 2003, Plaintiff's special leave of absence expired.  On February 4, 2003, Plaintiff received a telephone call from Kristen Cowan of the TAC in Detroit, Michigan, who advised Plaintiff that she, Ms. Cowan, had noticed that Plaintiff had posted for "quite a few positions" through OAP but that the postings had not been processed because Plaintiff was not on active status.  [Defendants' SMF ¶ 44; Plaintiff's Aff. ¶ 32].  To Plaintiff's knowledge, Mr. Zimmer and Mr. Walls did not

10

have any role in Ms. Cowan's call to Plaintiff.  [Defendants' SMF ¶ 45].  On February 6, 2003, Mr. Walls sent Plaintiff a letter stating that her special leave of absence had expired on January 31, 2003, that she was being considered a "special separation" and that she would be provided with separation payments of $39,624 over the course of the next six and one-half (6 ½) months.  [Defendants' SMF ¶ 47; Plaintiff's Dep., Ex. 18; Plaintiff's Aff. ¶ 33].

At her deposition, Plaintiff testified as follows:

> Q:   Do you know of anyone who is on a special of leave of absence who had their submissions to the OAP considered and put through?
> A:   No, I don't.  I don't know anybody that's ever been on a special leave of absence.
> Q:   Okay.  Do you know anyone who's been on any kind of leave of absence who's had their submissions to the OAP put through?
> A:   No.  I've never asked that question.  Never had reason to.

[Plaintiff's Dep. at 185].  Plaintiff is not aware of any other quality resident managers who were offered a reassignment, turned it down and obtained another position through the efforts of Mr. Zimmer, Mr. Walls or Mr. Woods.  [Defendant's SMF ¶ 50].[2]

---

[2]Plaintiff was asked at her deposition, "Do you know of any other quality resident managers who were offered a reassignment, turned it down, and still got placed in another position?"  [Plaintiff's Dep. at 201].  She responded, "I believe if I thought about it long enough, I might be able to come up with somebody.  I might be able to think of that."  [Id.].  She provided no names of such individuals during her deposition.  [Plaintiff's Dep.].  Plaintiff now, in her affidavit filed in response to  the motion for

AO 72A
(Rev.8/82)

Plaintiff believes that Mr. Zimmer made the decision to terminate her employment and believes that the decision was based "[p]artially" on her gender, but she never heard Mr. Zimmer make any comments which were derogatory toward women or otherwise gender-based and "really can't say" why she believes her gender played a role in the decision. [Defendants' SMF ¶ 49].

---

summary judgment, states that she is aware of male employees who had postings to the OAP line considered and who received jobs and that she is aware of male employees who took a special leave of absence, at the end of which, Defendant GM made an effort to re-employ and did re-employ. [Plaintiff's Aff. ¶¶ 35-37]. No names or other means of identifying these employees is provided. [Id.]. Besides being vague, conclusory and unsupported self-serving statements, therefore, offering nothing to support Plaintiff's opposition to the motion for summary judgment, see Ratliff v. DeKalb County, 62 F.3d 338, 341 (11th Cir. 1995) ("[P]laintiffs seeking to avoid summary judgment . . . must present specific nonconclusory facts that would support a jury verdict against the particular defendant on discriminatory intent."), one or more of these statements contradict Plaintiff's unambiguous sworn deposition testimony and will not be considered by the court in resolving the summary judgment motion, see Van T. Junkins and Assoc., Inc. v. U.S. Industries, Inc., 736 F.2d 656 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."); see also Bank of Illinois v. Allied Signal Safety Restraint Systems, 75 F.3d 1162, 1173 (7th Cir. 1996) ("It is easy to determine that an affidavit produced in response to a summary judgment motion in contradiction of a prior statement is a 'sham' because such an affidavit is not difficult to produce and because it pops up in the immediate context of summary judgment.") (Cudahy, J., concurring).

On February 14, 2003, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and with the Michigan Department of Civil Rights.  [Defendants' SMF ¶ 48].

Additional facts will be set forth as necessary during the discussion of Plaintiff's claims.

**2.      Summary Judgment Standard**

The court should grant a motion for summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56.  The movant carries his burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325,106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.  Generally, "[t]he mere existence of a scintilla of evidence"

13

supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id.

"In an employment discrimination case, the plaintiff must produce sufficient evidence to support an inference that the defendant-employer based its employment decision on an illegal criterion." Benson v. Tocco, Inc., 113 F.3d 1203, 1207 (11th Cir. 1997). Summary judgment in favor of the defendant-employer is proper unless the plaintiff puts forth sufficient evidence to allow a fact finder to disbelieve each of employer's proffered explanations for its actions. See id. (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1532 (11th Cir. 1997), cert. denied, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998)). Rejecting the holding in prior cases that summary judgment is inappropriate in employment discrimination cases, the Eleventh Circuit Court of Appeals, sitting *en banc*, stated that "[t]he long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." Chapman v. AI Transport, 229 F.3d 1012, 1026 (11th Cir. 2000).

14

3.     **Discussion**

a.     **Preliminary Matters**

In Plaintiff's complaint filed on September 2, 2003, she includes a state law claim for intentional infliction of emotional distress.  [Doc. 1].  Plaintiff has moved to amend the complaint dismissing that claim from her allegations against Defendants.  [Docs. 34 and 39].  The court has granted in part Plaintiff's motion to amend the complaint dismissing the claim for intentional infliction of emotional distress.  [Doc. 47].  Accordingly, the court **RECOMMENDS** that Defendants' summary judgment motion on this state law claim be **GRANTED**.

In her complaint, Plaintiff alleged that she was seeking relief pursuant to 42 U.S.C. § 1981 for claims of gender discrimination.  [Doc. 1].  However, Plaintiff cannot use § 1981 to recover for discrimination claims based on her gender.  See Little v. United Technologies, Carrier Transicold Division, 103 F.3d 956, 961 (11th Cir. 1997) ("It is well-established that section 1981 is concerned with *racial* discrimination in the making and enforcement of contracts.") (emphasis in original).  A violation of § 1981 in the employment context, therefore, arises out of discrimination on the basis of race.  Accordingly,  to  the  extent  Plaintiff  is  pursuing  her  gender  discrimination  and

harassment claims through § 1981, the court **RECOMMENDS** that Defendants'
motion for summary judgment be **GRANTED** on Plaintiff's 42 U.S.C. § 1981 claims
of gender discrimination and harassment.

Additionally, in the complaint, Plaintiff included claims for gender discrimination
based on sexual harassment and for discrete discriminatory actions occurring
approximately one (1) year before the filing of her charge of discrimination with the
Equal Employment Opportunity Commission ("EEOC") on February 14, 2003.  [Doc.
1].  Defendant seeks summary judgment on those claims for failure to timely file a
charge with the EEOC.  [Doc. 29 at 2-7].  Plaintiff does not respond directly to
Defendants' arguments.  [Doc. 35 at 17-24].  Instead, Plaintiff states in her response
to the motion for summary judgment:  "The adverse actions upon which Plaintiff bases
her federal discrimination claims are Defendants' failure to make an effort to re-employ
Plaintiff and to consider Plaintiff's postings for jobs.  Both of these actions occurred
at the end of Plaintiff's special leave of absence which occurred in December of 2002,
and January of 2003."  [Id. at 17].  These claims are timely and will be considered by
the court.

The court finds, however, that Plaintiff has abandoned any other claims of
gender discrimination or of sexual harassment.  See Coalition for the Abolition of

Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1325-26 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (plaintiff's failure to either move for summary judgment on claim raised in complaint or to respond to defendant's summary judgment motion on same claim, allowed district court to properly treat claim as abandoned).  For this reason, the court **RECOMMENDS** that Defendants' motion for summary judgment on Plaintiff's Title VII claims of gender discrimination and sexual harassment occurring prior to December of 2002 be **GRANTED**.

Finally, Plaintiff is apparently seeking relief for her claims of Title VII gender discrimination from individually named Defendants Jerome Hunter, Barry Woods, and Gordon Zimmer.  [Doc. 1].  It is well settled that "[i]ndividual capacity suits under Title VII are . . . inappropriate."  Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991); see also Smith v. Lomax, 45 F.3d 402, 403 n. 4 (11th Cir. 1995) (individual defendants "cannot be held liable under . . . Title VII").  The Eleventh Circuit stated in Busby that "the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by

17

naming the employer directly." Id. Therefore, the court **RECOMMENDS** that as to Defendants Hunter, Woods, and Zimmer summary judgment be **GRANTED** on any Title VII claim against them in their individual capacities. Furthermore, because Plaintiff named the employer as a defendant, the court **RECOMMENDS** that summary judgment be **GRANTED** to individual Defendants as to Title VII claims against them in their official capacities. See Reynolds v. Glynn County Board of Education, 968 F. Supp. 696, 701 (S.D. Ga. 1996); Garrett v. Clarke County Board of Education, 857 F. Supp. 949, 952-53 (S.D. Ala. 1994).

The following claims remain pending before the court: Plaintiff's Title VII gender discrimination claims against Defendant GM for conduct occurring in December of 2002 and January of 2003 resulting in her separation from employment on February 6, 2003, and against all named Defendants for state law claims of wrongful termination and breach of contract.

**b.      Title VII Gender Discrimination**

Plaintiff contends that Defendant GM discriminated against her based on her gender when, in December of 2002 and January of 2003, Gordon Zimmer, executive director of GM's Powertrain unit, and Charles Walls, Powertrain's director of human

18

resources, failed "to make an effort to re-employ Plaintiff and to consider Plaintiff's postings for jobs." [Doc. 35 at 17]. As a result, when Plaintiff's special leave of absence expired on January 31, 2003, Plaintiff was separated from GM on February 6, 2003. Plaintiff seeks relief pursuant to 42 U.S.C. § 2000e of the Civil Rights Act.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). For individual disparate treatment claims, such that brought in this case, Plaintiff carries the burden of proof of demonstrating that Defendant has unlawfully discriminated against her. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). In a circumstantial evidence case, such as that herein, the allocation of burdens and order of presentation of proof are as follows: (1) Plaintiff has the burden of proving a *prima facie* case of discrimination by a preponderance of the evidence; (2) if Plaintiff proves the *prima facie* case, the court will presume discriminatory intent, and the burden (of production) then shifts to Defendant to articulate a legitimate, non-discriminatory reason for the action taken against the employee; and (3) if Defendant carries this burden, the presumption of discrimination is eliminated, and Plaintiff has an opportunity to prove

AO 72A
(Rev.8/82)

by a preponderance of the evidence that the legitimate reason offered by Defendant was a pretext for discrimination.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-804, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973); Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642-643 (11th Cir. 1998).

To establish a *prima facie* case of disparate treatment, Plaintiff must prove that: 1) she is a member of a protected class; 2) she was subjected to an adverse job action; 3) she was qualified to do the job; and 4) her employer treated similarly situated employees outside her classification more favorably.  See Lathem v. Dep't of Children and Youth Servs., 172 F.3d 786, 792 (11th Cir. 1999); Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1310 (11th Cir. 1998); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  Defendant contends that Plaintiff has not established that it treated male employees, similarly situated to Plaintiff, more favorably.  [Doc. 29 at 14-16; Doc. 37 at 10-13].  Defendant is correct.

Plaintiff has failed to produce or identify evidence that would permit a jury to find that Defendant treated similarly situated male employees more favorably than it treated her.  In Jones, the Eleventh Circuit emphasized that the proper comparison is to employees that are "similarly situated in all relevant respects."  Jones, 137 F.3d at 1311 (citing Holifield, 115 F.3d at 1562).  To establish this element of the *prima facie*

20

case, Plaintiff must produce evidence that would permit a jury to conclude that Defendant treated more favorably male employees who were in a similar situation to Plaintiff, that is, subject to a special or other type of leave, seeking a position for re-employment and not provided assistance in obtaining a new position which resulted in separation from employment.  See Lathem v. Dep't of Children and Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999) (the relevant inquiry is whether the employer subjected similarly situated employees to different employment policies).

As the evidence establishes, Plaintiff started a paid leave of absence, for a serious, non-work related, knee injury at the end of May 2001.  That paid leave of absence lasted until March 31, 2002.  [Defendants' SMF ¶ 21; Plaintiff's Aff. ¶ 9]. While on paid leave, Plaintiff was advised on August 30, 2001, by Barry Woods, Plaintiff's supervisor, that she was being reassigned from the facility in Doraville, Georgia, back to a Michigan facility, when her paid medical leave expired.  This was a lateral move with no reduction in pay or level.  [Defendants' SMF ¶ 22; Plaintiff's Aff. ¶ 10].  Although Plaintiff desired to remain in the Atlanta area, or further south, to be near her parents in Florida, Plaintiff did not want to return to the Doraville facility. She expressed her desire to remain in the Atlanta area to GM.  [Defendant's SMF ¶ 23].

AO 72A
(Rev.8/82)

In February 2002, Plaintiff was advised by Joe Mazzeo, a Powertrain quality director, that there were no positions in the Atlanta area and that Plaintiff had the following options upon the expiration of her medical leave:  (1) report to the new assignment in Michigan; (2) request a "special leave of absence" of up to six months, with no guarantee of re-employment at its conclusion; (3) accept an "external opportunity separation," through which GM would provide Plaintiff with more than a year of severance benefits; or (4) voluntarily resign.  He also informed Plaintiff that she could "exercise the Open Door Policy to discuss your situation with Powertrain Headquarters Human Resources . . ." but that a decision must be made by March 1, 2002.  [Defendants' SMF ¶ 25; Plaintiff's Dep., Ex. 5; Plaintiff's Aff. ¶ 12].  Plaintiff decided not to accept the position in Michigan but to enter the special leave of absence while she exercised GM's open door policy.  [Defendants' SMF ¶¶ 26, 27; Plaintiff's Dep. at 138-39].

Plaintiff was again advised that, if she selected the special leave of absence, there was no guarantee of re-employment and that the leave would last for six (6) months and would be unpaid.  [Defendants' SMF ¶ 27].  On March 26, 2002, Plaintiff was approved for the special leave of absence which would expire on September 30, 2002. That leave of absence, as accepted by Plaintiff, specified that "[t]he granting of this

leave of absence by [GM] is not a guarantee of reemployment following the expiration of the leave[,]" that "[u]pon expiration of this leave, I may be employed if conditions permit[,]" and that "[i]f re-employed, every effort will be made to reinstate me to my former position or one, in the opinion of GM, comparable to it."  [Plaintiff's Dep., Ex. 9].

Although the special of leave of absence was set to expire on September 30, 2002, Mr. Zimmer and Mr. Walls extended the period of the leave, first to allow Plaintiff the opportunity to complete the open door policy process and then several more times, eventually until January 31, 2003, to allow Plaintiff additional time to find a position in GM.  [Defendants' SMF ¶¶ 30, 32-35, 37, 39; Plaintiff's Aff. ¶¶ 20-22, 27].  However, while Mr. Zimmer offered to make some calls for Plaintiff and offered her use of GM facilities in her job search,[3] both Mr. Zimmer and Mr. Walls advised Plaintiff that they would not be assisting Plaintiff in finding a new position at GM and

_____

[3]Mr. Zimmer suggested that Plaintiff use and allowed Plaintiff to use the Opportunity Awareness Posting ("OAP"), an internal GM job search system, to look for a new position.  [Defendant's SMF ¶ 37].  Plaintiff did so but subsequently learned that, because she was not considered in "active" status due to her special leave of absence, she was not considered for the jobs for which she posted.  [Defendant's SMF ¶¶ 38, 44; Plaintiff's Aff. ¶¶ 27, 29-30, 32].  There is no indication in the record that Mr. Zimmer had any knowledge of how the OAP worked; it did not operate within his division and was not under his control.  [Defendant's SMF ¶ 37].

that it was not their responsibility to assist Plaintiff in obtaining re-employment within GM. [Defendant's SMF ¶¶ 31, 36-39, 41-43; Plaintiff's Dep. at 142-43; Plaintiff's Aff. ¶ 29]. Plaintiff had not obtained re-employment with GM by January 31, 2003; therefore, on February 6, 2003, Mr. Walls advised Plaintiff that she was being separated from GM and given separation payments totaling $39, 624. [Defendant's SMF ¶ 47].

Plaintiff has not identified a single male employee who experienced even remotely similar circumstances related to his employment with Defendant but who was provided assistance in securing continued employment. [Defendant's SMF ¶ 50; Plaintiff's Dep. at 185, 201]. At her deposition, when asked if she was aware of other quality resident managers, who after turning down a reassignment, were placed in another position, Plaintiff responded, "I believe if I thought about it long enough, I might be able to come up with somebody. I might be able to think of that." [Plaintiff's Dep. at 201]. However, she provided no names of such individuals during her deposition or later. And, despite offering a vague claim to the contrary in her affidavit filed in response to the motion for summary judgment, she has still failed to identify a single employee of any gender in any position at GM facing circumstances similar to those faced by Plaintiff but who received better treatment. [Plaintiff's Aff. ¶ 35-37]. Plaintiff also

explicitly denied being aware of anyone else who had ever attempted to use the OAP to find a position and was allowed to post for jobs despite being on a leave of absence. [Plaintiff's Dep. at 185].  Although, without explanation, she now asserts she knows of such male employees, she has not identified a single employee nor the circumstances surrounding his use of the OAP.  [Plaintiff's Aff. ¶ 35-37].

It is Plaintiff's burden, in establishing a *prima facie* case, to identify at least one similarly situated male employee who Defendant treated more favorably, see Lathem, 172 F.3d at 793, and, in opposing Defendant's motion for summary judgment, to "go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)); see also Ratliff, 62 F.3d at 341 ("[P]laintiffs seeking to avoid summary judgment . . . must present specific nonconclusory facts that would support a jury verdict against the particular defendant on discriminatory intent.").  Plaintiff has satisfied neither burden in responding to the motion for summary judgment.  Nor may Plaintiff wait, as she seems to indicate she intends to do [Doc. 35 at 23], until a later time to provide the missing evidence necessary to satisfy the *prima facie* case and to oppose the motion for summary judgment.  See Golden Oil Company, Inc. v. Exxon Company, 543 F.2d 548, 551 (5th Cir. 1976) ("It is elementary that where the party moving for summary

25

judgment supports his motion with sworn matter or admissions, the opponent bears the burden of presenting affidavits or other proper matter sufficient to create a genuine dispute of fact.  Pleadings will not suffice to defer the evil day, and the opposing party, facing such a situation, may not choose to wait until trial to develop claims or defenses relevant to the summary judgment motion.")[4]; United States v. Reinhardt College, 597 F. Supp. 522, 526 (N.D. Ga. 1983) (same).

Additionally, the court notes that Plaintiff has not produced any other evidence that provides an inference of gender discrimination in the circumstances leading up to her separation.  Plaintiff believes that Mr. Zimmer made the decision that resulted in her separation.  [Defendant's SMF ¶ 49].  Although Plaintiff testified that she believes the decision was based "[p]artially" on her gender, she never heard Mr. Zimmer make any comments which were derogatory toward women or otherwise gender-based and "really can't say" why she believes her gender played a role in the decision.  [Id.].

Plaintiff was placed in the position of seeking re-employment because she declined a reassignment.  [Defendants' SMF ¶¶ 25, 28, 29; Plaintiff's Dep. at 138-39].

---

[4]Decisions of the Fifth Circuit rendered before October 1, 1981, are binding upon panels of the Eleventh Circuit.  See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

26

Defendant did not seek to terminate Plaintiff.  Nor did Defendant seek to hasten her departure after Plaintiff turned down the reassignment and opted for the special leave of absence.  That leave of absence was extended four (4) months beyond the original term by the very individual who supposedly discriminated against Plaintiff.  [Defendants' SMF ¶¶ 33, 35; Plaintiff's Aff. ¶ 27].  Plaintiff was allowed more than sufficient time to find a new position with GM and was warned for months that there were no openings in the Powertrain unit.  [Defendant's SMF ¶ 24, 31, 36; Plaintiff's Dep. at 142-43].

The fact that neither Mr. Zimmer, Mr. Walls, nor anyone else at GM found Plaintiff a new position is not evidence of discrimination.  Plaintiff was advised by her supervisor that she was not guaranteed re-employment if she exercised the option of a special leave of absence.  [Defendants' SMF ¶¶ 27, 28].  The special leave of absence provisions which Plaintiff accepted stated that Plaintiff was not guaranteed re-employment and would only be re-employed if conditions permit.  [Plaintiff's Dep., Ex. 9].  There was no guarantee to assist Plaintiff prior to the time that Plaintiff was re-employed.  The special leave of absence provisions specifically stated that "[i]f re-employed, every effort will be made to reinstate me to my former position or one, in the opinion of GM, comparable to it."  [Id.].  Plaintiff was never re-employed;

27

therefore, no one at GM was under any obligation to assist Plaintiff.  Plaintiff was also verbally advised, on more than one occasion, that she would not be receiving assistance in obtaining employment.  [Defendant's SMF ¶¶ 36, 41, 42, 43; Plaintiff's Dep. at 142; Plaintiff's Aff. ¶ 29].  The issue is not whether GM could have assisted Plaintiff, or whether it would have been more fair to assist Plaintiff.  "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the [law] does not interfere.'"  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)).

Plaintiff has not established a *prima facie* case of gender discrimination with respect to the events in December of 2002 and January of 2003 which resulted in her separation from Defendant GM in February of 2003.  For these reasons, the court **RECOMMENDS** that Defendant's motion for summary judgment on Plaintiff's Title VII claims of gender discrimination be **GRANTED**.

c.    **State Law Claims**

Plaintiff also brings state law claims of breach of contract and wrongful discharge under Georgia law.  [Docs. 1 and 15].[5]  Twenty-eight U.S.C. § 1367(c)(3) provides, in pertinent part, "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction. . . ."  Because summary judgment has been recommended on all of Plaintiff's federal claims, the court **RECOMMENDS** that supplemental jurisdiction not be exercised over Plaintiff's remaining state law claims and that they be dismissed without prejudice.  See United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139, 16 L. Ed. 2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

---

[5]This court has denied Plaintiff's motion to amend the complaint seeking to now assert these state law claims pursuant to Michigan statutory provisions.  [Doc. 47].

29

**4.    Conclusion**

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendants' motion [Doc. 29] for summary judgment be granted on all of Plaintiff's federal claims and on Plaintiff's state law claim of intentional infliction of emotional distress and that Plaintiff's remaining state law claims be dismissed without prejudice.

The Clerk is **DIRECTED** to terminate this reference.

**SO RECOMMENDED** this 7th day of June, 2005.


/s/_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE

30